UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RONIS YOEL ESPINAL,

                 Plaintiff,

              - against -

CAROLYN W. COLVIN, Commissioner,
Social Security Administration,

                 Defendant.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
14-CV-3835 (RRM)

Plaintiff Ronis Yoel Espinal brings this action against defendant Carolyn Colvin,

Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42

U.S.C. § 405(g), seeking review of defendant's determination that he is not entitled to disability

insurance benefits under Title XVI of the Social Security Act.  Espinal and the Commissioner

have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure

12(c).  (Pl.'s Mot. J. Pls. (Doc. No. 16); Def.'s Mot. J. Pls. (Doc. No. 19).)  For the reasons set

forth below, Espinal's motion is granted in part and denied in part and the Commissioner's

motion is granted in part and denied in part.  The ALJ's decision is reversed and the matter

remanded.

## BACKGROUND

### I.     Procedural History

On February 25, 2012, Espinal applied for Supplemental Security Income ("SSI")

benefits, alleging disability due to human immunodeficiency virus (HIV), stomach problems, and

mental problems.  (Admin. R. (Doc. No. 22) at 170–78, 189.)  Espinal alleges that he became

completely disabled on December 14, 2011.  (*Id.* at 184.)  On August 27, 2012, Espinal's

disability claim was denied.  (*Id.* at 81–86.)  On October 25, 2012, Espinal requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 88–89, 90–92.)

Espinal received a hearing with the Social Security Administration ("SSA") Office of Disability Adjudication and Review in New York, New York.  (*Id.* at 13–41.)  On March 20, 2013, Espinal appeared before ALJ Lori Romeo, who adjourned the hearing to allow Espinal to seek council.  (*Id.* at 42–54.)  On July 22, 2013, ALJ Romeo presided over the second hearing where Espinal was represented by an attorney.  (*Id.*)  On December 2, 2013, the ALJ issued a decision that Espinal was not disabled within the meaning of the Social Security Act.  (*Id.* at 56–76.)  On April 25, 2014, the Appeals Council denied Espinal's request for review.  (*Id.* at 1–4.)  On June 19, 2014, Espinal filed the instant action against defendant.  (Compl. (Doc. No. 1).)

Before the Court are the parties' motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Pl.'s Mot. J. Pls.; Def's Mot. J. Pls.)  Espinal asserts that the ALJ erred in finding that she was not entitled to disability benefits.  (Pl.'s Mot. J. Pls. at 9–24.)  Defendant argues that the Commissioner correctly found that Espinal was not disabled.  (Mem. L. Supp. Def.'s Mot. J. ("Def.'s Mem.") (Doc. No. 20) at 23.)

## II.  Administrative Record

### a.  Non-Medical Evidence

Espinal was born in 1986 outside of the United States.  (Admin. R. at 170.)  He attended special education classes and completed high school.  (*Id.* at 19, 190, 412.)  Espinal worked at a McDonald's between 2004 and 2005 and for a maintenance cleaning service in March 2008.  (*Id.* at 166, 182, 190, 412, 439, 548.)

In a function report dated May 30, 2012, Espinal indicated that he lived alone in an apartment.  (*Id.* at 197.)  He stated that he has no problems with personal care, but he needs

reminders to take his medication.  (*Id.* 198–99.)  Espinal prepares his own meals daily with a microwave oven, consisting of meat, pasta, soup, and vegetables.  (*Id.* at 199.)  Espinal indicated that he goes out daily and either walks or uses public transportation, which he can do alone.  (*Id.* at 200, 206.)  He shops in stores for clothing, food, toiletries, and household cleaning products.  (*Id.* at 201.)  He cleans his apartment.  (*Id.* at 200.)  Espinal stated that his hobbies and interests consist of watching television, going to the beach, and seeing his family.  (*Id.* at 201–02.)  Espinal indicated that he can pay bills but does not use a savings account.  (*Id.* at 201.)  He can sometimes slowly count change.  (*Id.*)  Espinal stated that he had no problems getting along with friends, family, bosses, and other authority figures.  (*Id.* at 202, 204.)

Espinal indicated that he can walk for two to three hours before he needed to rest for twenty to thirty minutes.  (*Id.* at 203–04.)  He stated that his knee hurts when kneeling and his thigh hurts when squatting.  (*Id.* at 203.)  Espinal also indicated that he has problems paying attention, because he "forget[s] stuff."  (*Id.* at 204.)  He related that he could not finish what he started, because of "feeling bored."  (*Id.*)  He stated that he could follow spoken instructions, but could not follow written instructions.  (*Id.*)

Regarding his anxiety, Espinal stated that this condition has existed since he was eight years old.  (*Id.* at 205.)  He indicated that being in one place and feeling bored triggers panic attacks, for which he needs to "go out and get air."  (*Id.*)  His symptoms last one to two hours and medication calms him.  (*Id.* at 206.)

At his disability hearing, Espinal testified that he is disabled because he does not know how to read or write and because he has trouble working with others.  (*Id.* at 21–22, 24–25.)  He claimed that his HIV medications make him dizzy and that he tires easily due to his high viral load.  (*Id*. at 22, 24.)  He also has a recurrent problem with oral thrush.  (*Id.* at 23.)  With respect

to his fatigue, Espinal stated that he has good and bad days, with perhaps three days a week being good.  (*Id.* at 27.)  He also stated that he has difficulty sleeping at night, and sometimes is up the entire night.  (*Id.* at 32–33.)

With respect to physical activity, Espinal testified that he can walk about six blocks or stand for about one-half hour before becoming fatigued.  (*Id.* at 28.)  He stated that he could sit for about ten to twenty minutes before becoming uncomfortable and needing to get up and walk.  (*Id.* at 28–29.)  Espinal further stated that he has no trouble lifting and carrying items, but he sometimes has trouble pushing and pulling heavy items.  (*Id.* at 29.)

With respect to activities of daily living, Espinal testified that his mother is instructing him "little by little" on how to cook, and he generally prepares microwave-ready foods.  (*Id.* at 25.)  He stated that he cleans his own household, but does not do his own laundry.  (*Id.* at 25–26.)  He also testified that sometimes he does not bathe and has gone as long as two weeks without doing so.  (*Id.* at 36.)

**b.  Medical Evidence Prior to Plaintiff's SSI Application**

On July 27, 2010, Espinal presented for an initial clinic visit at St. Lukes-Roosevelt Hospital ("St. Lukes"), and was seen by Erin Mazza, P.A.  (*Id.* at 263–64, 266–68.)  The following medical history was noted: HIV, depression, syphilis, human papillomavirus (HPV), hemorrhoids, gonorrhea, "hepatitis A/B immune," and cocaine abuse ("off/on").  (*Id.* at 263.)  His only current medication was Nexium.  (*Id.*)  When diagnosed with HIV in April 2009, Espinal's CD4 count was 910; it was 794 in June 2009.  (*Id.*)  He had not had any opportunistic infections.  (*Id.*)  In October 2009, Atripla, an antiviral medication, was prescribed, but Espinal had discontinued it on his own due to dizziness.  (*Id.*)  In November and December 2009, Espinal had taken Truvada, Reyataz, and Norvir, antiviral medications; however, he was non-adherent to

4

his medication schedule. (*Id.*) Espinal stated that with regard to depression, he had a history of self-cutting and had previously seen a psychiatrist. (*Id.* at 263–66.) He had taken Trazodone and Wellbutrin for several months, but not since June 2010. (*Id.* at 266.) He had never had a psychiatric hospitalization. (*Id.* at 266.) At the appointment, Espinal was noted to be in a good general state of health. (*Id.* at 264.) He had mild heartburn/reflux because he ran out of Nexium. (*Id.*) He denied weight change, weakness, fatigue, or fever. (*Id.*) He had good exercise tolerance and was able to do his usual activities. (*Id.*) Examination was unremarkable except for left-sided erythematous candidal lesions to the groin and left upper thigh. (*Id.* at 266.) Espinal's mood and affect were appropriate. (*Id.*) Ms. Mazza diagnosed HIV, candidiasis of skin and nails, and esophageal reflux. (*Id.* at 267.) Espinal was started on a multivitamin for HIV, Ketoconazole cream for candidiasis, and Nexium was continued for reflux. (*Id.*)

On July 29, 2010, Espinal saw clinical social worker Wendy Eng at St. Lukes. (*Id.* at 329–31.) Espinal reported that he spoke both English and Spanish, but was illiterate in both languages. (*Id.* at 330.) He also reported that he lived alone in an apartment. (*Id.*) On mental status examination, he appeared well-groomed and was cooperative, but impatient. (*Id.* at 331.) His motor activity was hyperactive. (*Id.*) He spoke normally with logical and coherent thought content and intact thought process. (*Id.*) He exhibited appropriate eye contact. (*Id.*) Espinal's mood was euthymic and his affect was appropriate. (*Id.*) Espinal's memory was intact. (*Id.*) He appeared to be impaired with regard to his general knowledge and minimally to moderately impaired with regard to insight. (*Id.*) His judgment was minimally impaired. (*Id.*) Ms. Eng's assessment was that Espinal, who had sporadic treatment compliance issues, appeared to have difficulty interpreting words beyond their literal meaning, although she noted that this might be due to his reported literacy issues. (*Id.*)

On October 25, 2010, Espinal's T-cell and viral load testing revealed a CD4 count of 573, CD4 percentage of 39.1, and viral load of 134,839. (*Id.* at 280.)

On December 21, 2010, Espinal returned to Ms. Mazza, reporting that his rash had improved with use of the Ketoconazole cream. (*Id.* at 269–70.) Upon examination, Espinal's left groin rash was mostly resolved. (*Id.* at 270.) Rectal examination revealed an external hemorrhoid. (*Id.*) Screening examination for venereal disease revealed no symptoms. (*Id.*) Ms. Mazza assessed that Espinal's HIV was asymptomatic; he declined to take antiviral medication for his HIV despite medical advice. (*Id.* at 269–70.)

On January 12, 2011, Espinal saw Amanda Motel, N.P. for his mental health issues. (*Id.* at 271.) Espinal reported feeling "good" with good sleep, appetite, and energy. (*Id.*) He denied having a depressed mood or suicidal thoughts. (*Id.*) On examination, Nurse Practitioner Motel noted that Espinal was casually dressed with good grooming and hygiene. (*Id.*) His mood was "good," and his affect was euthymic and of full range. (*Id.*) Espinal's thought process was logical and concrete. (*Id.*) He showed good insight and judgment. (*Id.*) Nurse Practitioner Motel diagnosed mixed depressive disorder, recurrent, and assessed his global assessment of functioning ("GAF") as 65–70.5. (*Id.*) She also noted that Espinal would continue taking Wellbutrin. (*Id.*)

Espinal was next seen by Ms. Mazza on February 9, 2011 for CD4 monitoring. (*Id.* at 274–78.) He presented with complaints of a runny nose and sore throat since returning from Virginia one week earlier, as well as a pruritic rash on his left upper groin and left hand. (*Id.* at 274.) He had also run out of Nexium. (*Id.*) Examination revealed a scaly rash in the left upper groin/abdomen and the left hand between the first and second digits. (*Id.* at 277.) Ear, nose, and throat examination was normal. (*Id.*) Espinal's lungs were clear to auscultation and

percussion. (*Id.*) Espinal's mood and affect were normal. (*Id.*) Ms. Mazza assessed Espinal's HIV as asymptomatic and his depression as stable on Wellbutrin. (*Id.* at 278.) She prescribed Claritin for chronic pharyngitis, noting that it was possibly an allergic reaction. (*Id.*) Ms. Mazza believed that Espinal's rash might be eczema, prescribed hydrocortisone, and referred Espinal to dermatology. (*Id.*) Espinal's reflux was deemed stable and he was continued on Nexium. (*Id.*)

The same day, Espinal followed up with Nurse Practitioner Motel regarding his depression. (*Id.* at 279.) Espinal described his mood as "good" and believed that medication was helping his depressive symptoms. (*Id.*) On mental status examination, Nurse Practitioner Motel noted that Espinal was casually dressed with good grooming and hygiene. (*Id.*) Espinal spoke at a normal rate and rhythm. (*Id.*) His mood was "good" and affect euthymic. (*Id.*) Espinal's thought process was logical and linear. (*Id.*) He showed good insight and judgment. (*Id.*) Nurse Practitioner Motel directed Espinal to continue taking Wellbutrin. (*Id.*)

Also on February 9, 2011, Espinal saw Susan Stepakoff, Ph.D. for psychotherapy at St. Lukes. (*Id.* at 344.) Dr. Stepakoff noted that Espinal was euthymic and reported having a very good experience during his vacation with his family in Virginia. (*Id.*) He appeared emotionally stable. (*Id.*) Espinal stated that he continued to think about studying hairstyling, but a few programs he looked into required reading skills, which Espinal said he did not have. (*Id.*)

CD4 testing conducted that day revealed a CD4 count of 914 and CD4 percentage of 37.2. (*Id.* at 282.) Viral load was over 100,000. (*Id.* at 284.)

On February 16, 2011, Espinal reported to Ms. Mazza that his sore throat had resolved with Claritin, but that he still had a runny nose. (*Id.* at 280–82.) He was not on any antiviral medications. (*Id.*) Examination revealed mild worsening of erythematous. (*Id.* at 281.) Ear, nose, and throat examination showed clear rhinorrhea. (*Id.*) Ms. Mazza noted that Espinal's

mood and affect were normal. (*Id.*) She directed Espinal to take Nasonex for allergic rhinitis. (*Id.*)

Espinal returned to Ms. Mazza on April 27, 2011 with complaints of ear pain of three days' duration with decreased hearing. (*Id.* at 284–86.) On examination, a three pound (2%) weight gain was noted. (*Id.* at 285.) Espinal's mood and affect were normal. (*Id.*) There was a mild worsening of erythematous. (*Id.*) Ear, nose, and throat examination revealed the left tympanic membrane to be within normal limits. (*Id.*) There was pain in the right periarticular area with no drainage, but there was blood obscuring the tympanic membrane. (*Id.*) Due to the blood, Espinal was referred for an urgent care appointment with an ear, nose, and throat specialist. (*Id.* at 286.) Espinal's HIV was asymptomatic and he was given another dermatology referral as his prior appointment had been canceled. (*Id.*)

The same day, Espinal reported to Nurse Practitioner Motel that he had returned from a month-long vacation in Virginia with his family; he enjoyed his trip and was in "bright" spirits. (*Id.* at 283.) He had run out of Wellbutrin three weeks earlier, but denied changes in mood, appetite, energy, or sleep and had no complaints. (*Id.*) Mental status examination revealed no changes from the last appointment. (*Id.*) Nurse Practitioner Motel assessed that Espinal was stable and would resume taking Wellbutrin. (*Id.*) She stressed the importance of continued medication adherence to prevent a relapse of symptoms. (*Id.*)

Espinal saw Dr. Stepakoff as well on April 27, 2011 and reported that he greatly enjoyed visiting his family in Virginia. (*Id.* at 469.) Dr. Stepakoff noted that his mood was euthymic. (*Id.*)

On May 23, 2011, Espinal reported to Ms. Mazza for CD4 monitoring. (*Id.* at 287.) He told Ms. Mazza that his "very bad" right ear infection had resolved with use of ear drops. (*Id.* at

287–90.)  Espinal's mood and affect were normal.  (*Id.*)  He complained of a sore throat of five days' duration accompanied by pain swallowing and swollen neck lymph nodes.  (*Id.*)  Examination revealed excoriated erythematous papules on the left hand.  (*Id.* at 288.)  Ear, nose, and throat examination showed the right tympanic membrane to be mildly erythematous.  (*Id.* at 289.)  There was erythema and white fluffy exudates on the oropharynx and soft palate.  (*Id.*)  As this was Espinal's first time having thrush, he agreed to start antiviral medication (Epzicom /Reyataz and liquid Norvir).  (*Id.*)  Diflucan was also prescribed for the thrush.  (*Id.* at 289–90.)

The same day, Espinal saw Shilesh Iyer, M.D. for an initial dermatology visit at St. Lukes.  (*Id.* at 360–62.)  Dr. Iyer diagnosed dyshidrosis and eczematous dermatitis and prescribed Clobetasol cream.  (*Id.* at 360.)

Testing conducted that day revealed Espinal's CD4 to be 697, CD4 percentage to be 29, and viral load to be 527,628.  (*Id.* at 295, 299.)

On July 19, 2011, Espinal reported to Nurse Practitioner Motel that he had been out of Wellbutrin since April.  (*Id.* at 291.)  He denied symptoms of depression.  (*Id.*)  Espinal stated that he had been "vacationing" in Virginia with his family and that two weeks earlier he had "blacked out" after spending the day on the beach.  (*Id.*)  He could not remember the incident, but reported being passed out for one hour.  (*Id.*)  He did not seek medical attention and had no further episodes.  (*Id.*)  He denied illicit drug use.  (*Id.*)  Mental status examination was unchanged, except insight and judgment were deemed fair rather than good.  (*Id.*)  Espinal was to resume Wellbutrin.  (*Id.*)

Espinal, who was overdue for follow-up, was seen by Ms. Mazza on September 20, 2011.  (*Id.* at 265, 292–97.)  He stated that he had been in Virginia with his family for two months.  (*Id.* at 292.)  Espinal reported that he had taken his antiviral medication

(Truvada/Reyataz/Norvir) for only one month since it was prescribed in May and had since been non-adherent with medication and non-compliant with appointments. (*Id.*) Espinal reported abdominal pain, worse after eating certain foods, but that he had not been watching his diet. (*Id.*) He also reported a nighttime cough, occurring three to four times per week, and that his left groin rash had returned. (*Id.*) Previously, Espinal's rash had resolved with the use of Clobetasol cream prescribed by Dr. Iyer. (*Id.*)

Espinal additionally reported that one to two months earlier, he had felt like he wanted to hurt himself and, in response, had cut his left forearm. (*Id.*) He stated that he was depressed and anxious due to a relationship issue, had stopped taking his Wellbutrin, and had not been seen for a mental health follow-up. (*Id.*) He stated that he felt depressed, but denied suicidal ideation. (*Id.*) Espinal also stated that he had sporadically used cocaine, most recently in August 2011. (*Id.* at 265.) Upon examination, there were mild bilateral tender notes and erythematous papules at the left waistline and superficial excoriations on the left forearm. (*Id.* at 295.) Espinal's mood and affect were normal. (*Id.*) Espinal agreed to restart the antiviral regimen, but needed to demonstrate appointment compliance first as Ms. Mazza was concerned about Espinal developing resistance. (*Id.* at 297.)

The same day, Espinal reported to Nurse Practitioner Motel that a few weeks earlier, he "tried to kill [him]self," by cutting his left inner arm with a knife. (*Id.* at 298.) Nurse Practitioner Motel noted "two faint superficial excoriations" on his arm. (*Id.*) After further inquiry, Espinal denied that he cut himself with any suicidal intent, but rather as a means of dealing with "feeling pissed off." (*Id.*) He reported that just prior to cutting himself, he was involved in a verbal altercation with his boyfriend, and that after cutting his arm he felt immediate relief. (*Id.*) Espinal denied further self-injurious behavior, as well as any suicidal

thoughts, plan, or intent. (*Id.*) He admitted that he had not taken his Wellbutrin for the past two months and admitted its role in keeping him calm and less irritable. (*Id.*) He could not identify any barriers to taking his medication. (*Id.*) Espinal stated that he was not sleeping well, had low energy, and was fatigued. (*Id.*) He stated that he was looking forward to an upcoming vacation in the Dominican Republic to visit his father's side of the family. (*Id.*) On examination, Espinal was casually dressed. (*Id.*) He spoke at a normal rate and rhythm. (*Id.*) His mood was "good now" and his affect euthymic. (*Id.*) Espinal's thought process was concrete. (*Id.*) His insight was fair and his judgment was poor. (*Id.*) Nurse Practitioner Motel wrote that Espinal's symptoms were likely due to psychopharmacological/treatment non-adherence. (*Id.*) She worked with Espinal on identifying the ways that his medication was helpful, as well as alternative and safer coping mechanisms for dealing with anger. (*Id.*) Espinal was to restart Wellbutrin. (*Id.*)

Also on September 20, 2011, Espinal saw Ms. Eng. (*Id.* at 372, 493.) Espinal discussed his cutting incident, stating that he was with his boyfriend at the time, who took the knife away from him after making only three vertical cuts to his left arm. (*Id.*) Espinal reported that he had put Band-Aids on the cuts and did not seek medical attention. (*Id.*) According to Espinal, he did not contact St. Lukes because he did not want to be "lock[ed] up." (*Id.*) Espinal was encouraged to keep appointments and speak with his team, especially when feeling depressed, rather than engaging in self-destructive actions. (*Id.*) Espinal also discussed his plans to file for citizenship and his concern about how his illiteracy would affect his application. (*Id.*)

On September 28, 2011, Espinal was seen by Ms. Mazza for a small subconjunctival hemorrhage, which required supportive care only. (*Id.* at 299–303.) He was to begin antiviral therapy the following week. (*Id.* at 302.)

When Espinal returned on January 4, 2012, Ms. Mazza noted that Espinal was supposed to have begun antiviral therapy in October 2011, but did not keep his appointments. (*Id.* at 303–06.) He denied depression. (*Id.* at 303.) Examination was unremarkable except for a mildly tender external hemorrhoid. (*Id.* at 305.) Espinal's mood and affect were normal. (*Id.*) Ms. Mazza noted that Espinal's HIV was asymptomatic and that he agreed to begin antiviral medication the following week. (*Id.* at 306.) Testing that day revealed that his CD4 was 536, CD4 percentage was 29, and viral load was 516,000. (*Id.* at 315.)

On January 11, 2012, Espinal returned to Ms. Mazza to start antiviral medication (Epzicom/Reyataz and liquid Norvir). (*Id.* at 307–09.) His examination was unremarkable. (*Id.* at 309.) Espinal's mood and affect were normal. (*Id.*) Asymptomatic HIV was diagnosed. (*Id.*)

On January 19, 2012, Espinal reported to Ms. Mazza that he was 100% compliant with his antiviral medication and was having no side effects. (*Id.* at 310–13.) Espinal complained of continued pain with bowel movements and rectal chlamydia was discussed. (*Id.* at 310.) Examination was unremarkable. (*Id.* at 311.) Espinal's mood and affect were normal. (*Id.*) Ms. Mazza assessment was asymptomatic HIV and chlamydial infection. (*Id.* at 313.) A colonoscopy performed on February 14, 2012, revealed condyloma and mild, chronic, non-specific inflammation. (*Id.* at 320–22.)

### c. Medical Evidence After Plaintiff's SSI Application

#### i. Keith Degi, M.D. – Treating Psychiatrist

On May 2, 2012, Espinal was seen as a walk-in by Keith Degi, M.D. at St. Lukes. (*Id.* at 314.) Dr. Degi noted that Espinal had been inconsistent with his medical and psychiatric care and had last seen his mental health provider, Nurse Practitioner Motel, in September 2011. (*Id.*) Espinal stated that his depression had returned and he wanted to resume

treatment.  (*Id.*)  He denied suicidal ideation or plan, but reported depressed mood, crying episodes, anhedonia, and decreased energy and concentration.  (*Id.*)  Espinal had also not been compliant with his antiretroviral therapy for several months.  (*Id.*)  Mental status examination revealed calm affect and euthymic mood.  (*Id.*)  Espinal's speech was coherent.  (*Id.*)  He had no hallucinations or delusions.  (*Id.*)  His insight and judgment were fair.  (*Id.*)  Espinal reported that he did much better when taking his Wellbutrin, and Dr. Degi prescribed Wellbutrin.  (*Id.*)

On June 25, 2012, Espinal returned to Dr. Degi after missing a previously scheduled appointment.  (*Id.* at 318–19.)  Espinal stated that he felt good when taking Wellbutrin and did not feel depressed anymore.  (*Id.* at 318.)  He reported no medication side effects.  (*Id.*)  Espinal also reported compliance with his antiviral medication over the past two weeks.  (*Id.*)  Mental status examination revealed calm affect and euthymic mood.  (*Id.*)  Espinal's speech was coherent.  (*Id.*)  He had no hallucinations or delusions.  (*Id.*)

Espinal did not return to Dr. Degi until February 13, 2013.  (*Id.* at 550–51.)  He reported that he had been doing well, but had stopped treatment after their last appointment.  (*Id.*)  Espinal also reported that his depression had returned and he felt overwhelmed.  (*Id.*)  He stated that he sometimes cut himself when angry.  (*Id.* at 551.)  On examination, Espinal's mood was euthymic.  (*Id.*)  His speech was spontaneous with regular rate and rhythm.  (*Id.*)  Espinal's thought content was appropriate to the situation and his thought process was coherent.  (*Id.*)  He denied having hallucinations, delusions, or homicidal or suicidal ideation.  (*Id.*)  Espinal was to restart Wellbutrin and begin taking Trazodone to help him sleep.  (*Id.*)

On March 1, 2013, Espinal reported to Dr. Degi that he was feeling better while back on Wellbutrin and Tazodone and was experiencing no side effects.  (*Id.* at 564.)  Mental status was unchanged.  (*Id.*)  Espinal was to continue on Wellbutrin and Trazodone.  (*Id.*)

On April 8, 2013, Dr. Degi completed an anxiety questionnaire and a bipolar or manic depressive questionnaire. (*Id.* at 661–65.) On the bipolar or manic depressive questionnaire, Dr. Degi indicated that Espinal had depression syndrome characterized by sleep disturbance, decreased energy, and difficulty concentrating or thinking. (*Id.* at 663.) Dr. Degi assessed that Espinal did not have marked restrictions in performing activities of daily living or marked difficulties in maintaining social functioning. (*Id.* at 662, 664.) He further indicated that Espinal had no repeated episodes of deterioration or decompensation in work or work-like settings, but on the anxiety questionnaire marked "N/A" noting that Espinal did not work for the same question. (*Id.* at 662, 665.) On the anxiety questionnaire, Dr. Degi opined that Espinal's anxiety disorder rendered him completely unable to function outside the area of his home. (*Id.* at 662.) Dr. Degi also indicated that Espinal did not have deficiencies of concentration, persistence, or pace, but on the bipolar or manic depressive questionnaire stated that he had no information because Espinal did not work in response to the same question. (*Id.* at 662, 664.)

### ii. Punyadech Photangtham, M.D. – Treating Physician

On May 24, 2012, Espinal was seen by Punyadech Photangtham, M.D., at St. Lukes. (*Id.* at 315–17.) Espinal stated that he had been out of medication for one or two months. (*Id.* at 315.) He presented with complaints of sinus congestion, headaches, and bilateral ear pain. (*Id.*) Ear, nose, and throat examination revealed boggy nasal mucosa, swollen turbinates, bulging red tympanic membranes bilaterally, and white plaque oral mucosa. (*Id.*) Examination was otherwise unremarkable. (*Id.* at 316–17.) Dr. Photangtham prescribed Fluconazole for thrush, Cipro and Sudafed for sinusitis, and Cortisporin Otic for otitis media. (*Id.* at 317.)

Espinal declined restarting antiviral therapy. (*Id.*) Testing that day revealed that Espinal's CD4 was 503 and his CD4 percentage was 21.5. (*Id.* at 543.)

### iii. Wendy Eng – Clinical Social Worker

On February 16, 2011, Ms. Eng noted in a progress report that Espinal arrived for his scheduled medical appointments that day and reported that he was doing okay. (*Id.* at 348.)

On May 30, 2012, Ms. Eng assisted Espinal in completing various forms in conjunction with his application for Social Security benefits. (*Id.* at 400.) Espinal was also in the process of applying for citizenship and brought in a "Medical Certification for Disability Exceptions" form to be completed by a mental health provider. (*Id.*) Ms. Eng discussed with Espinal the importance of treatment adherence. (*Id.*) Espinal reported that he had been in Virginia for about two months and had ran out of medication during that time. (*Id.*) Accordingly, Ms. Eng discussed making arrangements for medication when Espinal was out of town. (*Id.*)

On June 25, 2012, Espinal requested Ms. Eng's assistance reading a form sent to him by the SSA for his completion. (*Id.* at 403.) Ms. Eng informed Espinal of the content of the form and assisted him with completing it (diagnoses, medication, dates and types of procedures done, hospitalizations, and primary care physician contact information). (*Id.*)

On October 24, 2012, Espinal again saw Ms. Eng for help completing a form related to his Social Security appeal due to his inability to read. (*Id.* at 537.) He stated that he had just returned from the Dominican Republic. (*Id.*) Ms. Eng discussed medication adherence issues with Espinal, as he had missed multiple appointments and stopped his medication in May when they "ran out." (*Id.*)

On February 13, 2013, Espinal returned to see Ms. Eng for help with Social Security appeal forms. (*Id.* at 548–49.) Ms. Eng noted that Espinal had been out of care for eight months for no apparent reason. (*Id.*) Testing that day revealed that Espinal's CD4 was 451 and his CD4 percentage was 22. (*Id.* at 561.)

### iv.     Jerome Caiati, M.D. – Internal Medicine Consultation

Jerome Caiati, M.D., conducted a consultative internal medicine examination on June 28, 2012.  (*Id.* at 406–09.)  Espinal provided a history of: HIV, depression, allergic rhinitis, asthma, hemorrhoidectomy in 2009, and tympanic membrane disorder unspecified.  (*Id.*)  His current medications were Norvir, Reyataz, Epzicom, Wellbutrin, Proventil inhaler, and Nexium.  (*Id.* at 406.)  Espinal stated that he had smoked between one and two packs of cigarettes a day, but had stopped a month earlier.  (*Id.*)  He drank beer socially and denied using street drugs.  (*Id.*)  Espinal stated that he lived alone and was able to cook, clean, do laundry, go shopping, shower, bathe, and dress himself.  (*Id.*)  He watched television, listened to the radio, went out for appointments, shopped, and visited his mother.  (*Id.*)  His hobbies were dancing and music.  (*Id.*)

On examination, Espinal appeared to be in no acute distress.  (*Id.* at 407.)   Examination of the skin, lymph nodes, head, face, eyes, ears, nose, throat, and neck were all unremarkable.  (*Id.*)  The abdomen was soft and non-tender.  (*Id.*)  Examination of the cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*)  There was no scoliosis, kyphosis, or abnormality in the thoracic spine.  (*Id.*)  The lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*)  There was full range of motion of the shoulders, elbows, forearms, and wrists bilaterally.  (*Id.* at 407–08.)  There was full range of motion of the hips, knees, and ankles bilaterally.  (*Id.* at 408.)  Strength was 5/5 in the upper and lower extremities.  (*Id.*)  The extremities revealed no cyanosis, clubbing, or edema.  (*Id.*)  Pulses were physiologic and equal.  (*Id.*)  There were no significant varicosities or trophic changes.  (*Id.*)  No muscle atrophy was evident.  (*Id.*)  Espinal's hand and finger dexterity was intact.  (*Id.*)  Grip and pinch strength were 5/5 bilaterally.  (*Id.*)

Dr. Caiati diagnosed history of: HIV positive status, depression, allergic rhinitis, asthma, hemorrhoidectomy, and tympanic membrane disorder unspecified. (*Id.*) He opined that Espinal's ability to sit, stand, walk, reach, push, pull, lift, climb, and bend was unrestricted. (*Id.*)

### v. Jean Brown, Ph.D. – Psychiatry Consultation

Jean Brown, Ph.D., conducted a consultative psychiatric evaluation on June 28, 2012. (*Id.* at 412–415.) Espinal traveled approximately five miles to the evaluation with his mother. (*Id.* at 412.) He reported that he lived alone and had graduated from high school, but was placed in special education because he could not read or write. (*Id.*) Espinal also reported a psychiatric hospitalization in 2005 for a suicide attempt and stated that he was currently receiving outpatient treatment. (*Id.*) Espinal reported difficulty falling asleep and loss of appetite with a weight loss of about five pounds. (*Id.* at 412–413.) He denied symptoms of depression and anxiety. (*Id.* at 413.) He denied panic attacks, thought disorders, and manic symptoms. (*Id.*) Espinal alleged that since junior high school, he had had cognitive symptoms such as short-term memory deficits, concentration difficulties, and organization difficulties. (*Id.*) Espinal reported that he could dress, bathe, and groom himself. (*Id.* at 414.) He stated that he prepared food using a microwave oven. (*Id.*) He did general cleaning, laundry, and shopping. (*Id.*) Managing money was difficult because he had difficulty counting change. (*Id.*) Espinal stated that he did not drive, but could take public transportation on his own. (*Id.*) He reported socialized with his partner, mother, brother, and sister. (*Id.*) His relationships were good. (*Id.*) Espinal stated that he had no hobbies or interests and spent his days watching television and listening to music. (*Id.*)

On mental status examination, Espinal was cooperative and his manner of relating was adequate. (*Id.* at 413.) Espinal was well groomed and his mode of dress was appropriate. (*Id.*)

Posture and motor behavior were normal and eye contact was appropriate. (*Id.*) Espinal's speech was fluent and the quality of his voice was clear. (*Id.*) His expressive and receptive language was adequate, and his thought processes were coherent and goal-directed. (*Id.*) Espinal's mood was euthymic, his affect was full range, and his speech and thought content was appropriate. (*Id.*)

Dr. Brown opined that Espinal's attention and concentration was impaired due to cognitive deficits. (*Id.* at 414.) Espinal performed counting and simple calculations; he could not perform serial threes from 20. (*Id.*) Dr. Brown also considered Espinal's recent and remote memory skills to be impaired due to cognitive deficits. (*Id.*) Espinal remembered three out of three objects immediately, one out of three objects after five minutes, four digits forward, and four digits backward with two digits inverted. (*Id.*) Dr. Brown deemed Espinal's general fund of information to be appropriate to his experience and estimated Espinal's intellectual functioning to be below average. (*Id.*) Espinal's insight and judgment were good. (*Id.*)

Dr. Brown diagnosed cognitive disorder, not otherwise specified (NOS). (*Id.* at 415.) He opined that Espinal could follow and understand simple directions and instructions, perform complex tasks with supervision, maintain a regular schedule, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (*Id.* at 414.) However, she opined that Espinal was unable to maintain attention and concentration. (*Id.*)

### vi.    R. Mcclintock, M.D. – Psychiatric Record Review

R. Mcclintock, M.D., a State agency psychiatric consultant, reviewed Espinal's medical record and completed a Psychiatric Review Technique form on February 24, 2012. (*Id.* at 438–51.) He determined that Espinal's mental impairment did not meet the criteria of the relevant listed impairment (mental retardation, Listing 12.05). (*Id.* at 416, 420.) With respect to the "B"

criteria of the Listing of Impairments, Dr. Mcclintock opined that Espinal had no restrictions of activities of daily living or difficulties in maintaining social functioning.  (*Id.* at 426.)  He opined that Espinal had moderate difficulties in maintaining concentration, persistence, and pace.  (*Id.*)  He noted that Espinal did not have repeated episodes of deterioration.  (*Id.* at 427.)  Dr. Mcclintock also assessed Espinal's residual functional capacity and determined that Espinal was "capable of basic work-related mental activities and functioning such as to be capable of basic occupational activities."  (*Id.* at 433.)

### vii. Sina Helbig, M.D. – Treating Physician

On February 13, 2013, Espinal was seen by Sina Helbig, M.D., at St. Lukes.  (*Id.* at 542–45.)  Espinal stated that he had not taken medicine since the summer because "I don't like too many pills."  (*Id.* at 542.)  However, Dr. Helbig noted that he was interested in restarting antiviral therapy if he could be put on a one pill a day regiment.  (*Id.*)  Espinal also inquired about smoking cessation and admitted to sporadic cocaine use.  (*Id.*)  He reported that his asthma was well controlled.  (*Id.*)  Espinal complained of an itchy rash on his left ear and decreased hearing at times.  (*Id.*)  He also reported some mild throat pain.  (*Id.*)  Examination revealed a scaly macular skin eruption on the left ear lobe.  (*Id.* at 543.)  There was extensive thrush noted upon examination of the mouth and throat.  (*Id.* at 544.)  Dr. Helbig prescribed Diflucan and Lotrimin cream for the ear lobe and Diflucan tablets for thrush.  (*Id.*)

Upon follow-up with Dr. Helbig on February 28, 2013, Espinal's rash was better and his thrush had resolved.  (*Id.* at 561–63.)  Espinal was to start Stribild for HIV and was counseled on the importance of adherence.  (*Id.* at 563.)  Dr. Helbig also noted some local superficial swelling of the left lateral trapezius area, of unclear etiology.  (*Id.* at 561, 563.)

In an HIV infection questionnaire completed on April 9, 2013, Dr. Helbig indicated that Espinal had a condition of the skin or mucous membrane with extensive fungating or ulcerating lesions that had not responded to treatment.  (*Id.* at 655–60.)

### viii.    Jeffrey Beck, Ph.D. – Consultative Examiner

Jeffrey Beck, Ph.D., conducted intelligence testing on February 14, 2013.  (*Id.* at 438–40.)  Testing revealed a full-scale IQ of 67, indicative of mild mental retardation.  (*Id.* at 439.)  Based upon his observations during testing, Dr. Beck assessed that Espinal was able to follow simple one-and-two-step directions with no difficulty.  (*Id.*)  He estimated that: Espinal's reading and writing skills were severely impaired and that Espinal was functionally illiterate; Espinal's ability to perform simple calculations was mildly impaired; and that Espinal exhibited a normal ability to hold a conversation.  (*Id.*)  Dr. Beck did not consider Espinal self-sufficient with respect to personal or social competence.  (*Id.*)  Dr. Beck diagnosed mild mental retardation.  (*Id.* at 440.)

### ix.    Stephen Rodgers, M.D. – Treating Physician

On March 22, 2013, Espinal was seen by Stephen Rodgers, M.D., at St. Lukes, with complaints of rectal bleeding.  (*Id.* at 575–79.)  At the appointment, Espinal stated that he just picked up his Stribild from the pharmacy, although it had been prescribed one month prior.  (*Id.* at 575.)  Rectal examination could not be completed due to pain and tenderness.  (*Id.* at 576.)  Espinal was instructed to take Colace and Senna for constipation.  (*Id.* at 577.)

### d.  Vocational Expert Evidence

On August 6, 2013, Andrew Pasternak, a vocational expert, answered a series of questions through an interrogatory.  (*Id.* at 252–56.)  Pasternak considered a hypothetical individual of Espinal's age, education, and work history, with the ability to perform a full range

of work at all exertional levels with the following nonexertional limitations: avoiding concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gases, and poor ventilation (due to asthma); limited to tasks with simple one and two step instructions that can be given verbally and would not require the use of arithmetic (due to intellectual disability); and avoiding operating heavy machinery, working at heights or near bodies of water, ladders, ropes and scaffolds, and driving (because of episodes of fatigue).  (*Id.* at 252.)  Based on this hypothetical, Pasternak identified several occupations that existed in significant numbers in the national economy.  (*Id.* at 253.)  He listed: grocery bagger (DOT No. 920.687-014), with 877,000 jobs existing nationally and 14,800 jobs locally; assembler of hospital products (DOT No. 712.687.010), with 300,000 jobs nationally and 5,000 jobs locally; and lens inserter (DOT No. 713.687-026), with 235,000 jobs nationally and 3,200 jobs locally.

### e.  Espinal's Disability Determination

On December 2, 2013, the ALJ issued a decision that Espinal was not disabled within the meaning of the Social Security Act.  (*Id.* at 56–76.)  On April 25, 2014, the Appeals Council denied Espinal's request for review.  (*Id.* at 1–4.)

## STANDARD OF REVIEW

## I.  Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).  "'[S]ubstantial evidence' is

'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.* (internal quotation marks omitted).  "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld."  *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)).  "This deferential standard of review does not apply, however, to the ALJ's legal conclusions."  *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010).  Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.  Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(2)(A).  This requires a five-step analysis for determining whether a claimant is disabled:

[1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

[2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

**I.  The ALJ Properly Found that Espinal's HIV Infection and Anxiety Related Disorder were Not of Listing-Level Severity; However, the ALJ Erred in Finding Espinal's Intellectual Disability was Not of Listing-Level Severity**

At step three of the sequential evaluation process explained above, the ALJ properly found that Espinal did not meet the listings for HIV Infection, and Anxiety Related Disorders. Further, in making these findings the ALJ did not violate the Treating Physician Rule. However, the ALJ did err in finding that Espinal did not meet the listing for Intellectual Disability because he could not produce evidence from before he turned 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.05, 12.06, 14.08.

**a.  HIV Infection – Section 14.08(F)**

Section 14.08, the HIV Infection listing, requires documentation of HIV and an additional complication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.08. Specifically, Espinal alleged an HIV based disability under subsection F, which requires evidence of "conditions of

the skin or mucous membranes . . . with extensive fungating or ulcerating lesions not responding to treatment (for example, dermatological conditions such as eczema or psoriasis, vulvovaginal or other mucosal Candida, condyloma caused by human Papillomavirus, genital ulcerative disease)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.08(F).

Espinal failed to satisfy the criteria of § 14.08(F) because there was not "sufficient objective supportive evidence in the file" to support Dr. Helbig's assertion that Espinal met the § 14.08(F) criteria. (Admin. R. at 62.) The ALJ explained that although Dr. Helbig, Espinal's treating physician, checked off the statement mirroring the language of § 14.08(F) on an HIV Infection questionnaire, the objective medical evidence in the record did not support such a finding. (*Id.* at 62; *see also id.* at 658.) The ALJ pointed to Dr. Caiati's finding that Espinal's skin "was within normal limits" during his consultative exam. (*Id.*) The ALJ also pointed to the contemporaneous progress notes from St. Lukes showing "occasional episodes of rash or thrush, but simply no discussion of extensive fungating ulcerating lesions not responsive to treatment." (*Id.*) Because the criteria of §14.08(F) are only satisfied when the relevant conditions do "not respond[] to treatment," the ALJ correctly found that Espinal did not meet the listing. (*Id.* at 62.) *See, e.g.*, *James v. Comm'r of Soc. Sec.*, No. 06-CV-6108 (DLI), 2009 WL 2496485, at *13 (E.D.N.Y. Aug. 14, 2009) (finding § 14.08(F) not applicable where "plaintiff's medical records indicate[d] that he developed rashes during the relevant period, they also indicate[d] that plaintiff responded well to treatment and that the rashes healed shortly after they developed").

The ALJ's finding here is supported by substantial evidence. The record shows that Espinal was found to have "conditions of the skin," such as thrush, rash, erythematous papules, and candidiasis. (*Id.* at 267, 269, 274, 277, 281, 285, 288–89, 292, 295, 317, 361, 544, 561, 658.) The record also shows that these conditions responded to treatment. (*Id.* at 269–70, 292,

316, 561.)  Accordingly, substantial evidence supports the ALJ's finding that Espinal's HIV was not of listing-level severity.

### b. The ALJ Did Not Violate the Treating Physician Rule with Respect to Dr. Helbig's Assessment

Espinal argues that the ALJ failed to follow the treating physician rule when he accorded no weight to Dr. Helbig's assessment.  (Pl.'s Mot. J. Pls. at 12.)  The regulations governing the ALJ's deliberation state that:

> Generally, [the ALJ] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).  However, the treating physician opinion's is only controlling if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  *Id.*  "[W]hen controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant."  *Rosado*, 713 F. Supp. 2d at 357 (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ properly accorded no weight to Dr. Helbig's opinion because the evidence on the record – including the St. Lukes treatment notes and Dr. Caiati's examination findings –

contradicted Dr. Helbig's indication that Espinal suffered from treatment resistant fungating ulcerating lesions. As discussed above, no record evidence supported Dr. Helbig's opinion. In fact, even Dr. Helbig's treatment notes contradict her opinion. Dr. Helbig's notes from Espinal's February 13, 2013 visit indicate that Espinal's HIV was asymptomatic and show that she prescribed medication for Espinal's nonspecific skin eruptions and thrush. (Admin. R. at 544.) Two weeks later, on February 28, 2013, Dr. Helbig noted that Espinal's ear rash was better and his thrush had resolved. (*Id.* at 561.) Although the record indicates that Espinal received treatment at St. Lukes as early as June 2010, it is not clear whether Espinal was treated by Dr. Helbig at any point prior to February 2013, two months prior to her completion of the HIV infection questionnaire. (*Id.* at 241, 542.)

As discussed above, substantial evidence supported the ALJ's determination that Espinal's HIV was not of listing-level severity, despite Dr. Helbig's opinion. As such, the ALJ did not violate the treating physician rule by according no weight to Dr. Helbig's assessment.

### c. Anxiety Related Disorders – Section 12.06

Section 12.06, defines Anxiety Related Disorders as disorders where "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

In order to establish an anxiety disorder of listing-level severity, a claimant must present specific medically documented findings as listed in subsection A and results as listed in either

subsection B or C.[1]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A)–(C).  Subsection A

requires:

> Medically documented findings of at least one of the following:
>
> 1. Generalized persistent anxiety accompanied by three out of four of the
>    following signs or symptoms:
>    a. Motor tension; or
>    b. Autonomic hyperactivity; or
>    c. Apprehensive expectation; or
>    d. Vigilance and scanning;
>    or
> 2. A persistent irrational fear of a specific object, activity, or situation which
>    results in a compelling desire to avoid the dreaded object, activity, or
>    situation; or
> 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset
>    of intense apprehension, fear, terror and sense of impending doom
>    occurring on the average of at least once a week; or
> 4. Recurrent obsessions or compulsions which are a source of marked distress;
>    or
> 5. Recurrent and intrusive recollections of a traumatic experience, which are a
>    source of marked distress.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A).

The ALJ correctly found that Espinal failed to satisfy the criteria of § 12.06 because the

record contains no medically documented findings as required by subsection A.  The ALJ noted

that Espinal "has not been diagnosed with an anxiety-related disorder – not by [his] treating

psychiatrists, and not by either of the psychological consultative examiners."  (Admin. R. at 64.)

This finding is supported by substantial evidence.  Espinal points to Dr. Degi's completion of an

anxiety questionnaire.  (Pl.'s Mot. J. Pls. at 13.)  However, the questionnaire shows that Dr. Degi

marked "no" for each of the five possible subsection A requirements.  (Admin. R. at 661–62.)

While Dr. Degi mark "yes" for the subsection C finding, subsections A and C must *both* be met

to meet the listing requirements of § 12.06.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

---

[1] Espinal solely argues that he meets the criteria of subsection C, which requires a "complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C).  This argument is irrelevant to the analysis of whether Espinal meets the criteria of subsection A.

Because there is no medically documented evidence as required by subsection A, substantial evidence supports the ALJ's finding that Espinal did not meet the criteria of § 12.06.

### d. The ALJ Did Not Violate the Treating Physician Rule with Respect to Dr. Degi's Assessment

Espinal argues that the ALJ failed to follow the treating physician rule when he accorded no weight to Dr. Degi's assessment that Espinal had a complete inability to function outside of his home. (Pl.'s Mot. J. Pls. at 13.) Importantly, the ALJ did not accord no weight to Dr. Degi's assessment in determining that Espinal did not meet the criteria of § 12.06. Dr. Degi's anxiety questionnaire specifically found that none of the subsection A criteria were met, which is necessary to meet the § 12.06 listing regardless of whether subsection C is met.

Nevertheless, the ALJ was not required to accord controlling weight to Dr. Degi's opinion that Espinal could not function outside of his home because Espinal's medical records and testimony contradicted Dr. Degi's assessment. (*See* Admin. R. at 26, 39, 200–02, 283, 298, 344, 406, 537.) The ALJ pointed to several pieces of evidence that contradicted Dr. Deggi's assessment when he considered the criteria of § 12.04 (Affective Disorders) as an alternative to § 12.06. (*Id.* at 63.) Substantial evidence supports the ALJ's decision to credit this alternative evidence over Dr. Degi's questionnaire. For example, Espinal reported that he goes outside daily, shops occasionally, takes public transportation, brings his clothing to the laundromat, and travels to the Dominican Republic and Virginia. (*Id.* at 26, 200, 202, 283, 298, 344, 537.) He is able to travel alone. (*Id.* at 206.) He goes to appointments, church, the beach, the park, and his mother's house. (*Id.* at 39, 201–02, 406). Additionally, Dr. Helbig and Dr. Degi both noted that Espinal has no marked limitations of activities of daily living, or social functioning. (*Id.* at 66, 662.)

As discussed above, the ALJ is not required to give controlling weight to a treating physician's opinion where it is not supported by objective medical evidence and is inconsistent with other record evidence. *See* 20 C.F.R. § 404.1527(c)(2). Such is the case here. *See Gibbs v. Astrue*, No. 07-CV-10563 (GBD) (AJP), 2008 WL 2627714, at *21 (S.D.N.Y. July 2, 2008), *report and recommendation adopted,* 2008 WL 4620203 (S.D.N.Y. Nov. 3, 2008) ("As to subsection 12.06(C), Gibbs' own statements and testimony showed that she shopped, used public transportation and took the bus to see her doctors two to three times each week; Gibbs thus could function independently outside the area of her home. ALJ Walsh correctly concluded that Gibbs' anxiety was not disabling.")*; see also Rosado v. Astrue*, 713 F. Supp. 2d 347, 364 (S.D.N.Y. 2010) ("With respect to 12.06(C), Rosado's own testimony and actions demonstrate his ability to function independently outside the area of his home."). Accordingly, the ALJ did not violate the treating physician rule in determining that Espinal did not meet the criteria of § 12.06.

### e.  Intellectual Disability – Section 12.05

The ALJ erred in finding that Espinal's intellectual disability was not of listing-level severity. "[I]ntellectual disability refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. In order to establish intellectual disability of listing-level severity, a claimant's evidence must "demonstrate[] or support[] onset of the impairment before age 22." *Id.* Specifically, Espinal alleged an intellectual disability under subsection C, which requires, "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

The ALJ found that Espinal failed to satisfy the criteria of § 12.05(C) because he did not

show significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested before age 22. (Admin. R. at 64.) The ALJ acknowledged that Espinal "does have a valid verbal performance, or full scale IQ of 60 through 70, as documented by Dr. Beck, and he does have another physical or mental impairment imposing an additional and significant work-related limitation of function." (*Id.*) However, he found that this was insufficient as "the Listing further requires that the evidence demonstrates or supports onset of the impairment before age 22." (*Id.*) Explaining his reasoning, the ALJ wrote:

> [Espinal] was a few weeks shy of age 27 when Dr. Beck administered formal intelligence testing. This record contains no objective medical or academic evidence dated prior to March 2008, when the claimant turned 22, to document an impairment of adaptive limitations during the earlier period. However, it is known through his testimony that he completed a high school education, which weighs against the representative's argument.

(*Id.*)

The Court finds that the ALJ erred in concluding that Espinal did not meet the criteria of § 120.05(C) because Dr. Beck's formal intelligence testing was administered when Espinal was 26 years of age. The listing does not require evidence *from* the developmental period, rather it requires evidence that supports a finding that the onset occurred during the developmental period. As the Commissioner has explained:

> The final rules clarify that we do not necessarily require evidence from the developmental period to establish that the impairment began before the end of the developmental period. The final rules permit us to use judgment, based on current evidence, to infer when the impairment began. This is not a change in interpretation from the prior rules.

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50754 (Aug. 21, 2000); *see also Santiago v. Astrue*, No. 07-CV-6239 (CJS), 2008 WL 2405728, at *4 (W.D.N.Y. June 11, 2008).

Moreover, this Circuit has recognized "that it is reasonable to presume, in the absence of

evidence indicating otherwise, that claimants will experience a 'fairly constant IQ throughout [their] li[ves].'" *Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012) (quoting *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001)); *see also Hilson v. Colvin*, No. 12-CV-1068S (WMS), 2014 WL 1219163, at *3 (W.D.N.Y. Mar. 24, 2014) ("IQ tests can create a rebuttable presumption of a fairly constant IQ throughout a person's life.").  Absent evidence of a change in intellectual functioning, it is appropriate to assume that the results of an IQ test administered after age 22 accurately reflect IQ prior to age 22.  *Mendez v. Astrue*, No. 11-CV-276S (WMS), 2012 WL 3095587, at *3 (W.D.N.Y. July 30, 2012).   Here, as Espinal correctly argues, there is no evidence of any change in intellectual functioning, and as such, Dr. Beck's testing, if properly weighed pursuant to these standards, could support a finding that Espinal had a low IQ prior to age 22.  (Pl.'s Mot. J. Pls. at 11.)

While it is true that an ALJ may find that IQ testing after age 22 does not accurately reflect a claimant's IQ before age 22, he must sufficiently explain such a finding.  *Id.* at *4 ("The ALJ did consider the score, but it appears that he did not accept it.  District courts in this Circuit have permitted such a ruling so long as the ALJ sufficiently explains the basis for his or her decision." (citing *Paulino v. Astrue*, No. 08-CV-2813 (CM), 2010 WL 3001752, at *22 (S.D.N.Y July 30, 2010) (collecting cases))).  The ALJ made no such finding here.  Though the ALJ noted that Espinal completed high school, the ALJ does not appear to rely on such evidence to find any change in intellectual functioning.  Furthermore, the record is clear that Espinal attended special education classes while in high school and graduated without developing the ability to read or write, facts that the ALJ did not explicitly mention in her IQ findings, and which undercut the ALJ's implication that Espinal's graduation from high school demonstrates intellectual functioning above the requisite standards for this Listing.  For all of these reasons, remand is

warranted with regard to Espinal's claim of intellectual disability under Section 12.05.

This finding must also be remanded as it is unclear whether the ALJ considered whether Espinal has shown the necessary "deficits in adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Adaptive functioning is defined as an "ability to cope with the challenges of ordinary everyday life." *Talavera*, 697 F.3d at 153 (internal quotation marks and citation omitted). "[C]ourts have held that if one is able to satisfactorily navigate activities such as 'liv[ing] on [one's] own,' . . . 'pay[ing] bills,' and 'avoid[ing] eviction,' one does not suffer from deficits in adaptive functioning." *Id.* Thus, "[w]hile a qualifying IQ score may be *prima facie* evidence that an applicant suffers from 'significantly subaverage general intellectual functioning,' § 12.05, there is no necessary connection between an applicant's IQ scores and her relative adaptive functioning." *Id.* As such, the ALJ must also consider whether Espinal has demonstrated the necessary deficits in adaptive functioning required by the listing.

## II.     The ALJ Properly Evaluated Espinal's Credibility

The ALJ must analyze the credibility of a claimant as to her symptoms through a two-step test. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must first decide "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Next, if the ALJ determines the claimant does have such an impairment, she must consider "'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(a) (alternations omitted)). Other evidence of record that the ALJ must consider includes:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

*Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R.

§ 404.1529(c)(3)). "While it is not sufficient for the ALJ to make a single, conclusory statement that the claimant is not credible or simply recite the relevant factors, remand is not required where the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision." *Cichocki v. Astrue*, 534 Fed. App'x. 71, 76 (2d. Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)) (internal quotation marks omitted). In such a case, "the ALJ's failure to discuss those factors not relevant to [her] credibility determination does not require remand." *Id.*

At step one of the inquiry, the ALJ found that Espinal's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Admin. R. at 68.) At step two of the inquiry, however, the ALJ found that Espinal's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible, stating that, "[s]pecifically, the claimant has not exhibited persistent acutely abnormal findings either physically or mentally, and no treating or examining source has asserted that he is completely precluded from performing all types of work activity." (*Id.*)

To make her determination, the ALJ relied on the record evidence and Espinal's testimony, using the above factors. (*Id.* at 68–69.) The ALJ first considered Espinal's daily activities, which include cooking, cleaning, using public transportation, spending time with family and his boyfriend, and bringing his clothes to the laundromat. (*Id.* at 68.) Finding that Espinal does not have "particularly frequent or intense symptoms," the ALJ next considered factors that aggravate the symptoms, such as Espinal's non-compliance with treatment and

medication. (*Id.* at 68–69.) The ALJ stated, "An individual cannot be found disabled based solely upon symptoms that result from non-compliance with treatment." (*Id.* at 69.) The ALJ determined that such non-compliance with treatment does "not enhance the credibility of the claimant's allegations of disabling symptoms." (*Id.*) Finally, the ALJ reviewed the statements set forth by treating, examining, or reviewing physicians. (*Id.*)

Substantial evidence supports the ALJ's finding that Espinal's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms were not entirely credible." (*Id.* at 68.) As the ALJ noted, Espinal cooked, cleaned, went to the laundromat, took public transportation, went to the beach, and went on lengthy vacations with his family. (*Id.* at 25–26, 199–202, 344, 537.) Further, the contemporaneous treatment records from St. Lukes did not reveal particularly frequent or intense symptoms, and the only aggravating factors appeared to be Espinal's own lengthy periods of non-compliance with treatment or medication. (*Id.* at 283, 292, 298, 314, 318, 537, 563.)

The ALJ was permitted to consider Espinal's noncompliance with treatment as a factor weighing against his credibility. "A claimant's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as proscribed." *Weed Covey v. Colvin*, 96 F. Supp. 3d 14, 33 (W.D.N.Y. 2015) (internal quotation marks and citation omitted); *see, e.g.*, *Schwerdt v. Comm'r of Soc. Sec.*, No. 5:14-CV-0895 (DNH), 2015 WL 5773021, at *10 (N.D.N.Y. Sept. 30, 2015) (upholding commissioner's adverse credibility findings as to the severity of plaintiff's depressive symptoms where plaintiff sought treatment for depression but reported that she "had stopped taking her prescribed medication and had engaged in mixed drug use"). However, the ALJ must first consider "any explanations that the individual may provide,

or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.* (internal quotation marks and citation omitted). The ALJ is not required to explicitly reference the specific evidence considered. *Id.* Here, Espinal's only reasoning for noncompliance with his medication were his lengthy travels and his statement to Dr. Helbig that he doesn't "like too many pills." (Admin. R. at 542.)

Accordingly, substantial evidence supports the ALJ's credibility determination at this step.

### III.    The ALJ's Hypothetical

The ALJ presented the vocational expert with a hypothetical individual of Espinal's age who "is unable to read or write but speaks and understands English and has no work experience . . . and is limited by intellectual disability to work with simple one and two step instructions that be given to the individual verbally and would not require the individual to use arithmetic." (Admin. R. at 252.) The ALJ properly based this hypothetical on her Residual Functional Capacity (RFC) assessment. *See Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (holding that the ALJ properly relied on the VE's responses to a hypothetical that was based on the ALJ's substantially supported RFC assessment). In determining Espinal's RFC, the ALJ explained:

> With regard to concentration, persistence or pace, [Espinal] has moderate difficulties. On formal mental status testing conducted by Dr. Brown during the psychological consultative examination in June 2012, the claimant exhibited impaired attention, concentration, and recent and remote memory. Specifically, although he could count and perform simple calculations, and recall 3 out of 3 objects immediately, he could not perform serial threes, and could only recall 1 out of 3 objects after a five-minute delay. While this represents a significant limitation within this domain, a "marked" or "extreme" limitation is not warranted. Dr. Brown opined that the claimant could still follow and understand simple directions and instructions, as did a subsequent psychological consultative examiner, Dr. Beck, in February 2013. Dr. Degi, the claimant's own treating psychiatrist, similarly did not state in his April 2013 questionnaire that the

claimant had deficiencies of concentration, persistence or pace that would result in frequent failure to complete tasks in a timely manner. . . .

Jean Brown, Ph.D., performed a psychological consultative examination of the claimant on June 28, 2012. . . . She opined, in her medical source statement that [Espinal] could not maintain attention or concentration in the work setting, although he could perform complex tasks with supervision. . . .

Dr. Beck, as noted above, performed intelligence testing of the claimant on February 14, 2013. . . . Dr. Beck concluded that [Espinal] had age-appropriate attention and concentration, and should be able to follow simple one- and two-stage directions with no difficulty. While he agreed that the [Espinal] appeared to be functionally illiterate, and had a mildly impaired ability to perform simple calculations, he further concluded that [Espinal] had normal abilities to hold a conversation, including speech and language development.

Dr. Keith Degi, one of [Espinal]'s treating psychiatrists at St. Luke's-Roosevelt, completed "Anxiety" and "Bipolar or manic depressive" questionnaires on [Espinal]'s behalf on April 8, 2013. He responded in the negative to all questions endorsing Listing-level symptoms and limitations, except to state that [Espinal] did have a complete inability to function independently outside the area of one's home. However, as noted above, this limitation cannot be accepted, in light of the fact that the claimant is able to live alone, cook, clean, see to the laundry, dress, bathe, groom himself, and take public transportation independently. Dr. Degi did not assess any "marked" limitations in the questionnaires.

(*Id.* at 63, 67–68 (internal citations omitted).)

Espinal asserts that the ALJ erred in relying on the vocation expert's testimony based on a hypothetical that failed to include difficulty with concentration and memory.[2] (Pl.'s Mot. J. Pls. at 20–24.) Though the Second Circuit has "not specifically decided whether an ALJ's hypothetical question to a vocational expert must account for limitations in concentration, persistence, and pace," it recently held that "an ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) 'medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace,' and the challenged

---

[2] Espinal also asserts that the ALJ erred in failing to consider the combined effects of his impairments in the hypothetical posed. Because this issue is remanded for the reasons addressed in this section, the Court does not reach this second argument.

hypothetical is limited 'to include only unskilled work'; or (2) the hypothetical 'otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace." *McIntyre v. Colvin*, 758 F.3d 146, 151–52 (2d Cir. 2014) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (collecting cases)).

Espinal correctly asserts that the ALJ found that he had moderate difficulties in concentration, persistence, and pace, but failed to include this finding in her hypothetical to the vocational expert. (Pl.'s Mot. J. Pls. at 21.) This failure was not otherwise implicitly accounted for because the ALJ made no mention of or reference to the impairment, either directly or indirectly, to the vocational expert. *See Hudson v. Comm'r of Soc. Sec.*, No. 5:10-CV-300 (JMC) (CR), 2011 WL 5983342, at *10 (D. Vt. Nov. 2, 2011), *report and recommendation adopted sub nom. Hudson v. Astrue*, 2011 WL 6002466 (D. Vt. Nov. 30, 2011) ("[T]he ALJ could have implicitly accounted for this limitation in her hypothetical to the VE by instructing the VE to fully credit Dr. Farrell's or another medical provider's particular findings with respect to this limitation."). Though the ALJ's hypotheticals were limited to unskilled work, (Admin. R. at 252–55), it is unclear whether the record supports a finding that Espinal is able to engage in simple, routine tasks or unskilled work.[3] While an ALJ's finding that a claimant is "able to perform simple, routine and repetitive tasks" may be "consistent with [an] assessment that [such claimant] had moderate difficulties with concentration, persistence or pace . . . [and] short-term

---

[3] The record contains mixed findings regarding Espinal's ability to engage in simple, routine tasks or unskilled work. Dr. Degi, Espinal's treating psychiatrist, found that Espinal had no deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner. (Admin. R. at 662.) This finding is questionable as, on a second questionnaire, Dr. Degi failed to answer yes or no to the same question and noted that he "do[es] not have info on this, but [Espinal] does not work." (*Id.* at 664.) Additionally, though Dr. Beck opined that Espinal "is able to follow simple 1- and 2-stage directions with no difficulty," it is unclear whether this can be equated to performing simple, routine tasks in a work environment in light of Dr. Beck's opinion that Espinal required supervision in order to be personally or socially competent. (*Id.* at 439.) On the other hand, Dr. Brown opined that, in spite of Espinal's inability to maintain attention and concentration, Espinal could still follow and understand simple directions and instructions. (*Id.* at 414.) Similarly, Dr. Mcclintock also opined that Espinal was "capable of basic work-related mental activities and functioning such as to be capable of basic occupational activities." (*Id.* at 433.) However, Dr. Mcclintock's findings were based solely on a review of the medical evidence.

memory problems," the ALJ made no such explicit finding here.  *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 315 (W.D.N.Y. 2013).  Because the ALJ did not determine whether Espinal is able to perform simple, routine and repetitive tasks, the Court cannot find harmless error here. Accordingly, this case must also be remanded for vocational expert testimony consistent with Espinal's RFC.

## CONCLUSION

For the reasons stated herein, Espinal's motion for judgment on the pleadings is granted in part and denied in part, the Commissioner's motion for judgment on the pleadings is granted in part and denied in part, and the case is remanded for further consideration consistent with this opinion.

The Clerk of Court is directed to enter judgment accordingly and close the case.


SO ORDERED.

Dated: Brooklyn, New York                    *Roslynn R. Mauskopf*
       September 8, 2016
                                      _____
                                      ROSLYNN R. MAUSKOPF
                                      United States District Judge